SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. F.E.D.** **(A-12-21) (086187)**

**Argued March 14, 2022 -- Decided August 3, 2022**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court considers what showing is required under the Compassionate Release Statute, N.J.S.A. 30:4-123.51e, for a court to order the release of an inmate not otherwise eligible for parole based on the inmate's suffering from "a permanent physical incapacity," N.J.S.A. 30:4-123.51e(f)(1).

Petitioner F.E.D., now seventy-three years old, was convicted of three counts of first-degree murder and will not be eligible for parole until 2040. In February 2021, the Managing Physician of the New Jersey Department of Corrections submitted to the Commissioner of Corrections a Request for Compassionate Release on behalf of F.E.D. In accordance with N.J.S.A. 30:4-123.51e(b), the Request included attestations of "medical diagnosis . . . made by two licensed physicians" designated by the Commissioner of Corrections.

The first attesting physician diagnosed F.E.D. with "severe dilated cardiomyopathy with unclear etiology" and "heart failure with reduced ejection fraction." The doctor opined that F.E.D. should be housed in the corrections facility's infirmary unit due to "diminished ability in instrumental activities of daily living," and that, if released, F.E.D. would require "significant help" with laundry, grocery shopping, preparation of meals appropriate to his condition, and house cleaning. The second attesting physician concurred with the primary diagnosis of cardiomyopathy and viewed F.E.D.'s prognosis to be "[p]oor due to heart failure with low cardiac function." Noting that F.E.D. was "[a]ble to do [activities of daily living] but takes a long time," the second doctor stated that F.E.D. "may need [a] walker or wheelchair when breathing problems worsen," that he would need assistance with grocery shopping, meal preparation, laundry, and cleaning if he lived in a home setting, and that he "[m]ay require [n]ursing home if no home setting with assistance." Based on the diagnoses provided by the attesting physicians, the Managing Physician found that F.E.D. "meets the medical conditions established" by N.J.S.A. 30:4-123.51e. Pursuant to N.J.S.A. 30:4-123.51e(d)(1), the Commissioner issued a Certificate of Eligibility for Compassionate Release.

1

F.E.D. filed a petition for compassionate release pursuant to N.J.S.A. 30:4-123.51e. The trial court held an evidentiary hearing on the motion. F.E.D. presented the testimony of a cardiologist, who testified about his treatment of F.E.D.'s cardiomyopathy. The doctor stated that when he initially evaluated F.E.D., F.E.D. was incapable of grocery shopping, but provided no further opinions on that issue. F.E.D. also presented the testimony of the Managing Physician, who reiterated his view that F.E.D. met the criteria for compassionate release and opined that it was "possible" that F.E.D. would have a terminal condition in the next six months. The Managing Physician testified that F.E.D.'s ability to perform activities of daily living "is very limited." He explained that F.E.D. took "a long time" to conduct such activities, needed "some assistance in getting around," and would need nursing home care "if his staging gets worse."

With regard to whether F.E.D. suffered from a "permanent physical incapacity" as defined in N.J.S.A. 30:4-123.51e(*1*), the trial court relied on the list of "activities of daily living" enumerated in the administration of New Jersey's Medicaid program, which the court identified to be bathing, dressing, toileting, locomotion, transfers, eating and bed mobility. Applying that standard to the medical diagnoses presented in F.E.D.'s petition for compassionate release, the trial court observed that the attesting physicians had found a diminished ability in instrumental activities of daily living but not an inability to perform activities of basic daily living. The court accordingly found that F.E.D. had not presented clear and convincing evidence that he suffered from a "permanent physical incapacity" within the meaning of N.J.S.A. 30:4-123.51e(d)(1).

The Appellate Division viewed the Department of Corrections' award of a Certificate of Eligibility for compassionate release to constitute an agency determination that must be upheld unless arbitrary or capricious. 469 N.J. Super. 45, 57-58 (App. Div. 2021). It ruled, however, that the Certificate of Eligibility for compassionate release that the Department issued to F.E.D. was invalid based on its view that the Compassionate Release Statute applies only to inmates whose medical conditions render them unable to perform any of the activities of basic daily living, and to be inapplicable to any inmate who can conduct one or more of those activities. Id. at 62, 65.

The Court granted certification. 248 N.J. 481 (2021).

**HELD:**     *The Compassionate Release Statute does not require that an inmate prove that he is unable to perform <u>any</u> activity of basic daily living in order to establish a "permanent physical incapacity" under N.J.S.A. 30:4-123.51e(*l*). Rather, the statute requires clear and convincing evidence that the inmate's condition renders him permanently unable to perform two or more activities of basic daily living, necessitating twenty-four-hour care.

2

\*The Compassionate Release Statute's mandate that the inmate's condition render him "permanently physically incapable of committing a crime," N.J.S.A. 30:4-123.51e(f)(1), requires an individualized assessment of the inmate's risk of recidivism focused on his capability, if released, of committing an offense similar to any crime of which he was convicted. If the inmate proves that he suffers from a "permanent physical incapacity" and the court therefore considers, pursuant to N.J.S.A. 30:4-123.51e(f)(1), whether his release on conditions "would not pose a threat to public safety," the court's inquiry is not restricted to potential offenses related to the inmate's criminal history, but entails a thorough analysis of any risk to the public posed by the inmate and the impact of his release conditions on that risk.

\*Assessing F.E.D.'s proofs in accordance with the statutory standard, he did not present clear and convincing evidence that his medical condition gave rise to a permanent physical incapacity under N.J.S.A. 30:4-123.51e(f)(1).

1. In 2019, the Criminal Sentencing & Disposition Commission proposed the enactment of legislation that would make compassionate release available to a broader class of inmates than those able to qualify for "medical parole" under then-existing legislation. The Compassionate Release Statute, enacted effective February 1, 2021, requires the Commissioner of Corrections to "establish and maintain a process by which an inmate may obtain a medical diagnosis," made by two licensed physicians designated by the Commissioner and addressing medical criteria enumerated in the statute, "to determine whether the inmate is eligible for compassionate release." N.J.S.A. 30:4-123.51e(b). Two medical diagnoses warrant the prompt issuance of a Certificate of Eligibility for Compassionate Release: a diagnosis of a "terminal condition, disease or syndrome" and a diagnosis of "permanent physical incapacity." N.J.S.A. 30:4-123.51e(d)(2). (pp. 19-22)

2. In the event of either of those diagnoses, "the Department of Corrections shall promptly issue to the inmate a Certificate of Eligibility for Compassionate Release," which authorizes the inmate to file a petition for compassionate release. N.J.S.A. 30:4-123.51e(d)(2). The statute provides for notice to the victim or the victim's family, N.J.S.A. 30:4-123.51e(e), and it imposes confidentiality restrictions on the petition and comments submitted in response to it, N.J.S.A. 30:4-123.51e(e)(4). The Compassionate Release Statute prescribes that an inmate is entitled to compassionate release "if the court finds by clear and convincing evidence that the inmate is so debilitated or incapacitated by the terminal condition, disease or syndrome, or permanent physical incapacity as to be permanently physically incapable of committing a crime if released and, in the case of a permanent physical incapacity, the conditions established in accordance with [N.J.S.A. 30:4-123.51e(h)] under which the inmate would be released would not pose a threat to public safety." N.J.S.A. 30:4-123.51e(f)(1). The Court reviews several additional provisions of the statute. (pp. 23-25)

3

3.  The Court does not agree that issuance of a Certificate of Eligibility by the Department of Corrections is a final agency decision that must be affirmed unless it is arbitrary or capricious.  See 469 N.J. Super. at 57-59.  Under the statute, the trial court, not the Department of Corrections, makes the initial determination whether the inmate has met his burden of proof by clear and convincing evidence, N.J.S.A. 30:4-123.51e(f), and that determination is subject to appellate review.  (pp. 26-27)

4.  The Court first construes the term "activities of basic daily living" as it appears in N.J.S.A. 30:4-123.51e(*l*), which defines a "permanent physical incapacity" as "a medical condition that renders the inmate permanently unable to perform activities of basic daily living" and "results in the inmate requiring 24-hour care."  The statute does not specify what tasks constitute "activities of basic daily living," but other New Jersey laws define such activities to include mobility, transferring, walking, grooming, bathing, dressing and undressing, eating, and toileting.  The Legislature's use of the adjective "basic" suggests intent to distinguish "activities of basic daily living" from "instrumental activities of daily living," a term used in other contexts to describe tasks such as cooking, cleaning, laundry, and shopping -- a distinction also suggested by requiring the need for twenty-four-hour care.  The Court concurs with the Appellate Division's conclusion that the term "activities of basic daily living" in N.J.S.A. 30:4-123.51e(*l*) includes eating, mobility, bathing, dressing, using a toilet, and transfers, and excludes instrumental activities such as shopping, house cleaning, food preparation, and laundry.  See 469 N.J. Super. at 61-62.  (pp. 28-31)

5.  The Court next considers the number of "activities of basic daily living" that the inmate must prove he is incapable of performing by virtue of his medical condition in order to be deemed to have a "permanent physical incapacity."  The Court disagrees with the Appellate Division's view that if an inmate can perform even one of the enumerated activities of basic daily living, he is unable to meet the statutory standard.  See 469 N.J. Super. at 62.  Nothing in the Compassionate Release Statute suggests the Legislature's intent that the inmate demonstrate that he is unable to perform any of the activities of basic daily living.  Based on the plain language of N.J.S.A. 30:4-123.51e(*l*), an inmate demonstrates a "permanent physical incapacity" for purposes of the Compassionate Release Statute if he proves by clear and convincing evidence that (1) he has a medical condition that did not exist at the time of sentencing; (2) that medical condition renders him permanently unable to perform two or more activities of basic daily living; and (3) as a result of the inmate's inability to perform those activities, he requires twenty-four hour care.  (pp. 32-34)

6.  Finally, the Court does not view N.J.S.A. 30:4-123.51e(f)(1) to require an inmate to prove by clear and convincing evidence that he is so debilitated or incapacitated that he is permanently physically incapable of committing any criminal offense.  That interpretation would contravene the Legislature's intent to expand opportunities for compassionate release beyond those afforded by the now-repealed medical parole

4

law and would render superfluous N.J.S.A. 30:4-23.51e(f)(1)'s additional mandate that the inmate prove that he poses no threat to public safety under the conditions of his compassionate release. The "physically incapable of committing a crime if released" language of N.J.S.A. 30:4-123.51e(f)(1) warrants a more nuanced approach. The court should conduct an individualized assessment of the inmate's risk of recidivism in order to assess whether he has met his burden of proof under that provision. It should determine whether that inmate is physically incapable, alone or with the assistance of another, of committing either the same crime or crimes of which he was previously convicted, or crimes similar to those of which he was convicted. For an inmate asserting a "permanent physical incapacity," this construction of the "physically incapable of committing a crime if released" language of N.J.S.A. 30:4-123.51e(f)(1) reserves a meaningful role for the statute's requirement that the inmate's release "would not pose a threat to public safety," an inquiry that is not limited to the threat that the inmate may commit any specific crime or category of crimes. (pp. 34-37)

7. The Court applies the statutory standard, reviews both the letters of diagnosis and the medical testimony that F.E.D. offered in support of his petition for release, and explains that F.E.D. failed to prove by clear and convincing evidence that he suffered from a "permanent physical incapacity" as defined in N.J.S.A. 30:4-123.51(e)(*l*). (pp. 37-40)

8. Turning to the Compassionate Release Statute's confidentiality provision, N.J.S.A. 30:4-123.51e(e)(4), the Court notes that medical information set forth in F.E.D.'s petition is crucial to determination of this appeal and is addressed in the opinion, see R. 1:38-1A, but that, because of the confidentiality restrictions, the Court has refrained from identifying F.E.D. in this decision, as did the Appellate Division, see 469 N.J. Super. at 48 n.1. That is not consistent with general practice. See generally R. 1:38-1 (noting "the policy of open access to records of the judiciary"). Explaining that the Compassionate Release Statute permits inmates convicted of serious crimes and not yet eligible for parole to seek release from incarceration; that it recognizes the right of victims and their families to notice; and that the petition is decided in a court hearing, rather than an administrative proceeding, under N.J.S.A. 30:4-123.51e(e), the Court respectfully urges the Legislature to provide guidance with respect to whether it envisions that courts will depart from the general practice of disclosing to the public the identity of a litigant seeking relief in the setting of a future compassionate relief proceeding. (pp. 40-43)

**AFFIRMED AS MODIFIED.**

**CHIEF JUSTICE RABNER; JUSTICES SOLOMON and PIERRE-LOUIS; and JUDGE FUENTES (temporarily assigned) join in JUSTICE PATTERSON's opinion.**

5

SUPREME COURT OF NEW JERSEY

A-12 September Term 2021

086187

State of New Jersey,

Plaintiff-Respondent,

v.

F.E.D.,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
469 N.J. Super. 45 (App. Div. 2021).

| Argued | Decided |
| --- | --- |
| March 14, 2022 | August 3, 2022 |

Alison Gifford, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora, Public
Defender, attorney; Alison Gifford, of counsel and on the
briefs).

Frank J. Ducoat, Special Deputy Attorney General/Acting
Assistant Prosecutor, argued the cause for respondent
(Theodore N. Stephens, II, Acting Essex County
Prosecutor, attorney; Frank J. Ducoat, of counsel and on
the briefs).

Angela Cai, Deputy State Solicitor, argued the cause for
amicus curiae Attorney General of New Jersey (Matthew
J. Platkin, Acting Attorney General, attorney; Angela
Cai, and Lauren Bonfiglio, Deputy Attorney General, of
counsel and on the brief).

1

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

Anne M. Collart argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Gibbons, attorneys; Anne M. Collart and Lawrence S. Lustberg, on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

For the first time, we interpret and apply the Compassionate Release Statute, N.J.S.A. 30:4-123.51e, which authorizes a court to order the release of an inmate not otherwise eligible for parole based on his medical condition if he satisfies the statute's requirements.

To meet the statutory standard, the inmate must present clear and convincing evidence that he suffers from either "a terminal condition, disease, or syndrome, or a permanent physical incapacity." N.J.S.A. 30:4-123.51e(f)(1). To be deemed to have a "permanent physical incapacity" for purposes of the statute, an inmate must demonstrate that he has a medical condition which he did not have at the time of sentencing that renders him "permanently unable to perform activities of basic daily living" and that "results in the inmate requiring 24-hour care." N.J.S.A. 30:4-123.51e(*l*).

2

If an inmate proves that he has a "terminal condition, disease, or syndrome" or a "permanent physical incapacity," he must then present clear and convincing evidence that his condition renders him "permanently physically incapable of committing a crime." N.J.S.A. 30:4-123.51e(f)(1). An inmate who seeks compassionate release based on a "permanent physical incapacity" rather than a "terminal condition, disease or syndrome" must also present clear and convincing evidence that the conditions under which he "would be released would not pose a threat to public safety." Ibid.

Petitioner F.E.D., convicted of three counts of first-degree murder, is serving two terms of life in prison and will not be eligible for parole until 2040. Diagnosed with cardiomyopathy and related conditions, he obtained a Certificate of Eligibility for Compassionate Release from the Department of Corrections pursuant to N.J.S.A. 30:4-123.51e(d)(2). He filed a petition for compassionate release, in which he contended that he suffered from a "terminal condition, disease or syndrome" and a "permanent physical incapacity" as defined by N.J.S.A. 30:4-123.51e(*l*).

The trial court held that F.E.D. had not established by clear and convincing evidence that he suffered from either a "terminal condition, disease or syndrome" or "permanent physical incapacity" under that statute. The court accordingly denied his petition for compassionate release.

F.E.D. appealed that determination, claiming on appeal only to have a "permanent physical incapacity," not a "terminal condition, disease or syndrome" under N.J.S.A. 30:4-123.51e(*l*).

The Appellate Division affirmed the trial court's judgment. State v. F.E.D., 469 N.J. Super. 45, 57-69 (App. Div. 2021). It construed the Compassionate Release Statute's requirement that the inmate prove he is "permanently unable to perform activities of basic daily living" to mandate proof that he is permanently "unable to perform any activity of basic daily living." Id. at 60-62 (emphasis added) (construing N.J.S.A. 30:4-123.51e(*l*)). The Appellate Division concluded that F.E.D.'s Certificate of Eligibility had been improperly issued because it was premised on medical diagnoses that did not establish a permanent physical incapacity as defined in N.J.S.A. 30:4-123.51e(*l*). Id. at 64.

We affirm as modified the Appellate Division's judgment. We do not concur with the appellate court that the Compassionate Release Statute requires that an inmate prove that he is unable to perform any activity of basic daily living in order to establish a "permanent physical incapacity" under N.J.S.A. 30:4-123.51e(*l*). Instead, we construe N.J.S.A. 30:4-123.51e(*l*) to require clear and convincing evidence that the inmate's condition renders him

4

permanently unable to perform two or more activities of basic daily living, necessitating twenty-four-hour care.

We view the Compassionate Release Statute's mandate that the inmate's condition render him "permanently physically incapable of committing a crime," N.J.S.A. 30:4-123.51e(f)(1), to require an individualized assessment of the inmate's risk of recidivism focused on his capability, if released, of committing an offense similar to any crime of which he was convicted.  If the inmate proves that he suffers from a "permanent physical incapacity" and the court therefore considers, pursuant to N.J.S.A. 30:4-123.51e(f)(1), whether his release on conditions "would not pose a threat to public safety," the court's inquiry is not restricted to potential offenses related to the inmate's criminal history, but entails a thorough analysis of any risk to the public posed by the inmate and the impact of his release conditions on that risk.

Assessing F.E.D.'s proofs in accordance with the statutory standard, we concur with the trial court and the Appellate Division that he did not present clear and convincing evidence that his medical condition gave rise to a permanent physical incapacity under N.J.S.A. 30:4-123.51e(f)(1).  We do not reach the question whether F.E.D. is "permanently physically incapable of committing a crime," or the question whether his compassionate release on

5

conditions would pose a threat to public safety under N.J.S.A. 30:4-123.51e(f)(1).

## I.

## A.

On December 16, 1980, F.E.D. pled guilty to one count of first-degree murder, N.J.S.A. 2C:11-3, and one count of third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4, for a murder committed while on parole. He was sentenced to a thirty-year term of incarceration with fifteen years' parole ineligibility.

Based on additional offenses committed while on parole, F.E.D. was convicted on June 15, 1982 of two counts of first-degree murder, N.J.S.A. 2C:11-3, and one count of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5. He was sentenced to two consecutive terms of life imprisonment on the murder counts, each with twenty-five years' parole ineligibility.[1]

F.E.D., now seventy-three years old, has a parole eligibility date of December 16, 2040.

---

[1] During his presentence interview, F.E.D. stated that he had strong feelings of anger; when asked to explain that comment, he said, "[o]ne day I'll be presented with a situation and be forced to commit a murder if that situation does not take care of itself." He added that he had "[n]othing to lose," and that he might "kill [a] person" who "[m]essed with" him.

6

B.

1.

On February 23, 2021, Hesham Soliman, M.D., Managing Physician of the New Jersey Department of Corrections, submitted to the Commissioner of Corrections a Request for Compassionate Release on behalf of F.E.D.

In accordance with N.J.S.A. 30:4-123.51e(b), the Request for Compassionate Release included attestations of "medical diagnosis . . . made by two licensed physicians" designated by the Commissioner of Corrections.

The first attesting physician, Barrington Lynch, M.D., diagnosed F.E.D. with "severe dilated cardiomyopathy with unclear etiology" and "heart failure with reduced ejection fraction." Dr. Lynch viewed F.E.D.'s prognosis to be "poor" unless an Automatic Implantable Cardioverter Defibrillator were implanted, and he considered a "subsequent heart transplant as a permanent solution." Dr. Lynch stated that F.E.D. required twenty-four-hour use of a LifeVest "due to risk of lethal ventricular fibrillation arrest" and took daily blood-thinner medication. Dr. Lynch opined that F.E.D. should be housed in the corrections facility's infirmary unit due to "diminished ability in instrumental activities of daily living," and that, if released, F.E.D. would require "significant help" with laundry, grocery shopping, preparation of meals

appropriate to his condition, and house cleaning. He said that as F.E.D.'s "condition deteriorate[d]" he would need a walker for fall prevention.

The second attesting physician, Sharmalie Perera, M.D., concurred with Dr. Lynch's primary diagnosis of cardiomyopathy, and noted that a cardiac stent was implanted in F.E.D. in 2020. Dr. Perera viewed F.E.D.'s prognosis to be "[p]oor due to heart failure with low cardiac function." As did Dr. Lynch, Dr. Perera recommended F.E.D.'s twenty-four-hour use of a LifeVest and a prescription of daily blood thinners. She advocated F.E.D.'s continued housing in the facility's infirmary unit. Dr. Perera noted that F.E.D. was "[a]ble to do [activities of daily living] but takes a long time," as he "[h]as to stop and rest after walking short distance due to difficulty breathing." She stated that F.E.D. "may need [a] walker or wheelchair when breathing problems worsen," that he would need assistance with grocery shopping, meal preparation, laundry, and cleaning if he lived in a home setting, and that he "[m]ay require [n]ursing home if no home setting with assistance."

Based on the diagnoses provided by Dr. Lynch and Dr. Perera, Dr. Soliman found that F.E.D. "meets the medical conditions established" by N.J.S.A. 30:4-123.51e. He informed the Commissioner that F.E.D.'s health was "poor" and that F.E.D. would require "home health care or nursing home level of care if home health care is unavailable."

8

Pursuant to N.J.S.A. 30:4-123.51e(d)(1), the Commissioner issued a Certificate of Eligibility for Compassionate Release based on the attesting physicians' diagnosis of "a terminal condition, disease or syndrome, or a permanent physical incapacity," specifically "[s]evere dilated cardiomyopathy with unclear etiology; an ejection fraction of 10% - 15%; underlying atrial appendage clot due to atrial fibrillation." The Commissioner stated in the Certificate of Eligibility that F.E.D. was "eligible and meets the requirement for Compassionate Release."

A New Jersey State Parole Board representative visited the home of F.E.D.'s wife and interviewed her. She agreed to permit F.E.D. to live in her home if he were to be released. The Parole Board approved F.E.D.'s release plan.

2.

F.E.D. filed a petition for compassionate release pursuant to N.J.S.A. 30:4-123.51e. The trial court held an evidentiary hearing on the motion.

F.E.D. presented the testimony of Dr. Mark Soffer, a cardiologist, who testified about his treatment of F.E.D.'s cardiomyopathy between December 20, 2020 and May 12, 2021. Dr. Soffer told the court that, on his recommendation, F.E.D. had been hospitalized in December 2020 and that doctors implanted a cardiac stent in F.E.D. during his hospitalization. He

9

testified that although F.E.D.'s ejection fraction -- a measure of the function of his left ventricle -- had improved from twenty-five to thirty percent during treatment, F.E.D. continued to experience shortness of breath and remained a candidate for a defibrillator. Dr. Soffer stated that F.E.D. had experienced atrial fibrillation in the past and continued to face a risk of atrial fibrillation and stroke. With respect to F.E.D.'s activities of daily living, Dr. Soffer stated that when he initially evaluated F.E.D. on December 20, 2020, F.E.D. was incapable of grocery shopping, but provided no further opinions on that issue.

F.E.D. also presented the testimony of Dr. Soliman, who reiterated his view that F.E.D. met the criteria for compassionate release. Dr. Soliman opined that it was "possible" that F.E.D. would have a terminal condition in the next six months. With respect to the question whether F.E.D. suffered from a "permanent physical incapacity" under N.J.S.A. 30:4-123.51e(*l*), Dr. Soliman stated that although F.E.D.'s medication may have improved the "severity of his cardiomyopathy," his condition "is not going to get better. It's actually going to get worse with time." Dr. Soliman testified that F.E.D.'s ability to perform activities of daily living "is very limited." He explained that F.E.D. took "a long time" to conduct such activities, needed "some assistance in getting around," and would need nursing home care "if his staging gets

10

worse."[2]  He stated that F.E.D. "would need extensive care at home, or, if he's not able to get home care, nursing home placement as suggested by the attesting physicians."[3]

The trial court found that F.E.D. had not established by clear and convincing evidence that he had a "terminal condition, disease, or syndrome" as defined in N.J.S.A. 30:4-123.51e(*1*).  The court noted that none of the documents supporting F.E.D.'s petition for compassionate release "put a temporal prognosis" on F.E.D.'s projected lifespan, and that Dr. Soliman did not testify that F.E.D.'s condition was terminal.

Addressing the question whether F.E.D. suffered from a "permanent physical incapacity" as defined in N.J.S.A. 30:4-123.51e(*l*), the court observed that the Legislature did not define "activities of daily living" in the Compassionate Release Statute.  It noted, however, that in N.J.S.A. 30:4-123.51e(h), the Legislature directed the Commissioner of Corrections to afford

---

[2]  Dr. Soliman stated that F.E.D. "does not ambulate."  He also stated that F.E.D. "may be able to walk and stand" but "going to long distances he probably would need the wheelchair."

[3]  F.E.D. also presented the testimony of his wife, who stated that she was willing to have F.E.D. live in her apartment and would take care of him, as well as the testimony of two men who had become acquainted with F.E.D. in prison and testified to his rehabilitation and remorse.  Additionally, F.E.D. presented to the trial court twenty-three letters from family members, fellow inmates, community leaders, and other friends and acquaintances who supported his petition for compassionate release.

11

inmates seeking compassionate release an opportunity to apply "for medical assistance benefits under the Medicaid program" under the Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5. The trial court therefore relied on the list of "activities of daily living" enumerated in the administration of New Jersey's Medicaid program, which the court identified to be "bathing, dressing, toileting, locomotion, transfers, eating and bed mobility."[4]

Applying that standard to the medical diagnoses presented in F.E.D.'s petition for compassionate release, the trial court observed that Dr. Lynch had not opined that F.E.D. had a permanent inability to perform activities of basic daily living, but rather had found only a "diminished ability in instrumental activities of daily living." The trial court further observed that Dr. Perera had confirmed that F.E.D. could perform activities of basic daily living but that it took a longer time for him to do so. The court accordingly found that F.E.D. had not presented clear and convincing evidence that he suffered from a "permanent physical incapacity" within the meaning of N.J.S.A. 30:4-123.51e(d)(1).

---

[4] The trial court evidently relied on N.J.A.C. 10:60-1.2, which defines "[a]ctivities of daily living (ADL)" to mean "activities related to self-care, performed either independently or with supervision or assistance," including, but "not limited to, dressing and undressing, bathing, eating, grooming, ambulation, transferring, toileting, and mobility."

The trial court noted that in light of its ruling that F.E.D. failed to demonstrate a terminal condition or permanent physical incapacity, it was not required to reach the question whether F.E.D. presented clear and convincing evidence that his condition rendered him "permanently physically incapable of committing a crime" and that the conditions under which he would be released "would not pose a threat to public safety" pursuant to N.J.S.A. 30:4-123.51e(f)(1). In what it characterized as "dictum," the court stated that notwithstanding evidence of recent rehabilitation, F.E.D. had not sustained his burden to prove that his release would not pose a threat to the public.

The trial court accordingly denied F.E.D.'s petition for compassionate release.

3.

F.E.D. appealed the trial court's determination. He contended that he suffered from a "permanent physical incapacity" because he required substantial assistance to perform activities of basic daily living, that he was permanently physically incapable of reoffending, and that he posed no threat to public safety.[5]

---

[5] Before the Appellate Division and this Court, F.E.D. abandoned his argument that he suffers from a "terminal condition, disease, or syndrome" under N.J.S.A. 30:4-123.51e(*l*).

13

The Appellate Division viewed the Department of Corrections' award of a Certificate of Eligibility for compassionate release to constitute an agency determination that must be upheld unless arbitrary or capricious. F.E.D., 469 N.J. Super. at 57-58. It ruled, however, that the Certificate of Eligibility for compassionate release that the Department issued to F.E.D. was invalid. Id. at 65. The Appellate Division viewed California's compassionate release statute and regulations, as well as New Jersey statutes and regulations defining "activities of basic daily living" in other settings, to "support the trial court's decision that 'activities of basic daily living' include only rudimentary but indispensable tasks like bathing, dressing, toileting, locomotion, transfers, eating and mobility." Id. at 60-62, 61 nn.13-14 (citing Cal. Penal Code § 3550; Cal. Code. Regs. tit. 15, § 3359.1(a)(1); N.J.S.A. 26:2Y-3; N.J.S.A. 17B:30B-2; N.J.A.C. 8:85-2.1(a)(1)). The appellate court reasoned that instrumental activities of daily living such as "shopping, house cleaning, food preparation and laundry" did not constitute activities of basic daily living. Id. at 62, 64.

The Appellate Division concluded that when the Legislature required an inmate seeking compassionate release to prove that his medical condition renders him permanently "unable to perform activities of basic daily living," it "meant 'unable to perform any activity of basic daily living.'" Id. at 62

14

(discussing N.J.S.A. 30:4-123.51e(*l*)). Thus, the Appellate Division viewed the Compassionate Release Statute to apply only to inmates whose medical conditions render them unable to perform any of the enumerated activities of basic daily living, and to be inapplicable to any inmate who can conduct one or more of those activities. Ibid.

Applying that standard, the Appellate Division held that because the diagnoses of Dr. Lynch and Dr. Perera "did not determine that F.E.D. was 'permanently unable to perform activities of basic daily living,'" those diagnoses "did not conform to the law's requirement that two physicians diagnose F.E.D. with a 'permanent physical incapacity' as defined." Id. at 64. Accordingly, the appellate court held that F.E.D. did not meet his burden to prove a "permanent physical incapacity" by clear and convincing evidence, and that the trial court had properly denied his petition for compassionate release. Id. at 65.

The Appellate Division noted that it did not need to reach the question whether F.E.D.'s condition rendered him physically incapable of committing a crime, or the question whether his release on conditions would pose a threat to public safety. Id. at 66. It offered "limited observations" regarding those issues, however. Ibid.

15

The Appellate Division viewed N.J.S.A. 30:4-123.51e(f)(1) to signal the Legislature's recognition that "a person who is 'physically incapable' of committing a crime may still pose a threat to public safety" but commented, "How that is so, is not so clear." Id. at 66. It acknowledged F.E.D.'s argument that a court should narrowly construe N.J.S.A. 30:4-123.51e(f)(1)'s requirement that an inmate prove that he is physically incapable of committing a crime to apply to "encompass only crimes 'requiring some level of physicality' and to exclude crimes like 'downloading child pornography or mailing a bad check.'" Id. at 66-67. The Appellate Division stated, however, that it was not convinced "that the Legislature intended 'physical[] incapab[ility]' to be so limited," given the statute's plain language and its legislative history, which reflected "an intention to create a strict standard." Id. at 67 (alterations in original).

Noting that "[t]hese are knotty issues," the Appellate Division deferred its determination of them "to a case requiring those decisions." Id. at 68-69. It affirmed the trial court's order denying F.E.D.'s petition for compassionate release. Id. at 69.

4.

We granted F.E.D.'s petition for certification. 248 N.J. 481 (2021). We also granted amicus curiae status to the Attorney General, the American Civil

16

Liberties Union of New Jersey, and the Association of Criminal Defense Lawyers of New Jersey.

## II.

### A.

F.E.D. urges the Court to reverse the Appellate Division's judgment. He contends that the Appellate Division misconstrued the Compassionate Release Statute's definition of "permanent physical incapacity." F.E.D. urges that we interpret N.J.S.A. 30:4-123.51e(*l*)'s requirement that the inmate be "permanently unable to perform activities of basic daily living" to mean that the inmate is "unable to perform most activities of daily living without assistance." He asserts that under the Appellate Division's interpretation of N.J.S.A. 30:4-123.51e(f)(1), only "comatose individuals" would be viewed to be "physically incapable of committing a crime" and would qualify for release. F.E.D. contends that he poses no threat to public safety.

### B.

The State argues that the Appellate Division's judgment should be affirmed. It contends that F.E.D. has not proven that he is "unable to perform activities of basic daily living," and that he has failed to establish by clear and convincing evidence that he has a "permanent physical incapacity" as defined in N.J.S.A. 30:4-123.51e(*l*). The State argues that at most, F.E.D. has

17

demonstrated that there is a possibility that he will be incapacitated in the future, not that he is currently unable to conduct the basic activities of daily living. It asserts that the trial court properly exercised its discretion when it found that F.E.D. would pose a threat to public safety if released, given F.E.D.'s three murder convictions for crimes committed while on parole.

### C.

Amicus curiae the Attorney General views the Appellate Division's construction of the Compassionate Release statute to be unduly restrictive. The Attorney General urges the Court to prescribe a "holistic assessment of the inmate's specific circumstances" to determine whether his condition renders him unable to perform sufficient activities of basic daily living so that he needs twenty-four-hour care. The Attorney General views N.J.S.A. 30:4-123.51e(f)(1)'s requirement that the inmate prove that he is "so debilitated . . . as to be permanently physically incapable of committing a crime if released" to require a determination whether the inmate "lacks the physical capacity to . . . commit the offenses attendant to his criminal history." The Attorney General takes no position on F.E.D.'s petition for compassionate release.

### D.

Amicus curiae the American Civil Liberties Union of New Jersey contends that the Appellate Division construed N.J.S.A. 30:4-123.51e(*l*)'s

18

mandate that the inmate be "permanently unable to perform activities of basic daily living" too narrowly. In its view, the public safety analysis required by N.J.S.A. 30:4-123.51e(f)(1) would have no purpose if only inmates who can perform no activities of daily living were eligible for consideration under the Compassionate Release Statute.

E.

Amicus curiae the Association of Criminal Defense Lawyers of New Jersey urges the Court to construe the Compassionate Release Statute broadly in accordance with its purpose of increasing the number of inmates eligible for release. It contends that the phrase "unable to perform activities of basic daily living" in N.J.S.A. 30:4-123.51e(*l*) requires that the inmate be "unable to perform more than one" such activity, not that he be unable to perform any such activities. Amicus contends that the Appellate Division incorrectly construed N.J.S.A. 30:4-123.51e(f)(1)'s requirements that the inmate prove he would be "incapable of committing a crime if released" and that he would not "pose a threat to public safety."

III.

A.

Pursuant to N.J.S.A. 30:4-123.51c, enacted in 1997, the New Jersey State Parole Board was authorized to grant "medical parole" to an inmate

19

found to be "so debilitated or incapacitated" by a "terminal condition, disease or syndrome" that he was "permanently physically incapable of committing a crime if released on parole."

In 2019, the New Jersey Criminal Sentencing & Disposition Commission found that N.J.S.A. 30:4-123.51c, "though well-intentioned, is rarely used," in part because "by the time an inmate qualifies for release, he or she is too ill to take the necessary steps to complete the process." N.J. Crim. Sent'g & Disposition Comm'n, Annual Report: November 2019 32 (2019). The Sentencing Commission proposed the enactment of a more expansive statute that would make compassionate release available to a broader class of inmates. Ibid.

Based on the Sentencing Commission's recommendation, the Legislature repealed N.J.S.A. 30:4-123.51c and enacted the Compassionate Release Statute, effective on February 1, 2021. L. 2020, c. 106, §§ 1, 3; see S. Judiciary Comm. Rep. on A. 2370 (Aug. 24, 2020) (noting that "[t]his bill would create a compassionate release program based on Recommendation 7" of the Sentencing Commission's first annual report). As the statute's Assembly sponsors explained after the bill was signed,

> Under our current medical parole system, very few of our gravely ill inmates meet the strict eligibility requirements. Our justice system is more than crime and punishment, it seeks to balance penalty with

20

rehabilitation. By expanding upon what already exists we can show true compassion to those with profound medical needs and those suffering terminal illness . . . . The financial realities of providing extensive medical care has burdened our already overcrowded prison system. Creating clear guidelines with this compassionate release program will allow us to reduce capacity, and alleviate financial strains while getting medically vulnerable residents the care they need outside of prison. Our treatment of those within our prisons is a reflection of our humanity. As we work to reduce the spread of COVID-19 we bear responsibility for protecting the vulnerable within our prison system. Ensuring the ongoing safety of our communities must include steps to preserve those who are incarcerated. Every life is valuable and worth defending.

[Off. of the Governor, Press Release: Governor Murphy Signs Sentencing Reform Legislation (Oct. 19, 2020) (quoting a joint statement by Assemblypersons Gary Schaer and Verlina Reynolds-Jackson).]

B.

The Compassionate Release Statute provides that "[n]otwithstanding any provision of [the Parole Act, N.J.S.A. 30:4-123.45 to -123.76,] to the contrary, [a] court may release an inmate who qualifies under this section for compassionate release at any time during the term of incarceration." N.J.S.A. 30:4-123.51e(a).[6]

---

[6] In contrast to the repealed medical parole statute, the Compassionate Release Statute does not exclude inmates from its reach based on the offenses for which they are serving their sentences. Compare N.J.S.A. 30:4-123.51c(a)(3)

21

The Compassionate Release Statute requires the Commissioner of Corrections to "establish and maintain a process by which an inmate may obtain a medical diagnosis," made by two licensed physicians designated by the Commissioner and addressing medical criteria enumerated in the statute, "to determine whether the inmate is eligible for compassionate release." N.J.S.A. 30:4-123.51e(b).

The Legislature identified two medical diagnoses that warrant the prompt issuance of a Certificate of Eligibility for Compassionate Release:  a diagnosis of a "terminal condition, disease or syndrome" and a diagnosis of "permanent physical incapacity."  N.J.S.A. 30:4-123.51e(d)(2).  It defined a "terminal condition, disease or syndrome" to mean a prognosis by the designated licensed physicians that the "inmate has six months or less to live." N.J.S.A. 30:4-123.51e(*l*).  It defined a "permanent physical incapacity" to mean a prognosis by the designated licensed physicians that the "inmate has a medical condition that renders [him] permanently unable to perform activities

---

(excluding from medical parole any inmate serving a sentence for murder, manslaughter, kidnapping, aggravated sexual assault, arson, endangering the welfare of a child, certain offenses involving the use of weapons, or of attempt to commit any of those offenses), with N.J.S.A. 30:4-123.51e (not excluding inmates from compassionate release based on the offenses for which they are serving their sentences).

22

of basic daily living, results in the inmate requiring 24-hour care, and did not exist at the time of sentencing." Ibid.

In the event that the statutory medical diagnosis determines that an inmate suffers "from a terminal condition, disease or syndrome, or permanent physical incapacity as defined in [N.J.S.A. 30:4-123.51e(*l*)], the Department of Corrections shall promptly issue to the inmate a Certificate of Eligibility for Compassionate Release." N.J.S.A. 30:4-123.51e(d)(2).[7] That Certificate authorizes the inmate to file a petition for compassionate release in the Superior Court, and it must be attached to the petition. N.J.S.A. 30:4-123.51e(d)(2), (e), (f)(2). The prosecutor, or the Attorney General in cases prosecuted by the Attorney General, must be given notice of the petition and must in turn provide notice to the victim or the victim's family, who may

---

[7] The Legislature defined a third medical diagnosis, a "[g]rave medical condition," as a prognosis by the designated licensed physicians "that an inmate has more than six months but not more than 12 months to live," or that the inmate "has a medical condition that did not exist at the time of sentencing and for at least three months has rendered the inmate unable to perform activities of basic daily living, resulting in the inmate requiring 24-hour care." N.J.S.A. 30:4-123.51e(*l*), (d)(1). The Department must promptly notify an inmate diagnosed with a "grave medical condition" and his attorney -- or, if the inmate has no attorney, the Public Defender -- "to initiate the process of petitioning for compassionate release." N.J.S.A. 30:4-123.51e(d)(1). Such an inmate is not authorized to file a petition for compassionate release "until a subsequent medical diagnosis determines that the inmate is suffering from a terminal condition, disease or syndrome, or a permanent physical incapacity as defined in [N.J.S.A. 30:4-123.51e(*l*)] and the Department of Corrections issues to the inmate a Certificate of Eligibility for Compassionate Release." Ibid.

23

participate in the proceeding under terms prescribed by the statute. N.J.S.A. 30:4-123.51e(e). The Compassionate Release Statute imposes confidentiality restrictions on the petition and comments submitted in response to it. N.J.S.A. 30:4-123.51e(e)(4).

The Compassionate Release Statute prescribes the standard for a court's determination whether the inmate is entitled to compassionate release:

> [T]he court may order the compassionate release of an inmate who has been issued a Certificate of Eligibility for Compassionate Release pursuant to [N.J.S.A. 30:4-123.51e(d)(2)] if the court finds by clear and convincing evidence that the inmate is so debilitated or incapacitated by the terminal condition, disease or syndrome, or permanent physical incapacity as to be permanently physically incapable of committing a crime if released and, in the case of a permanent physical incapacity, the conditions established in accordance with [N.J.S.A. 30:4-123.51e(h)] under which the inmate would be released would not pose a threat to public safety.
>
> [N.J.S.A. 30:4-123.51e(f)(1).]

The court must provide to the inmate and the prosecutor or Attorney General "written notice of its decision setting forth the reasons for granting or denying compassionate release," and the prosecutor or Attorney General shall notify the victim or member of the victim's family who was notified of the petition of the outcome of the court's decision. N.J.S.A. 30:4-123.51e(f)(3).

24

A court order granting a petition for compassionate release does not become final for ten days in order to permit the prosecution to appeal. N.J.S.A. 30:4-123.51e(g).

If the court grants compassionate release under the statute, it "shall require, as a condition precedent to release," the State Parole Board to ensure that the inmate's release plan includes identification of a community sponsor, as well as verification of appropriate medical services and appropriate housing. N.J.S.A. 30:4-123.51e(h).

In addition to conditions imposed pursuant to the Parole Act, N.J.S.A. 30:4-123.59, "as a condition of compassionate release, the State Parole Board may require an inmate to submit to periodic medical diagnoses by a licensed physician." N.J.S.A. 30:4-123.51e(i). The statute authorizes the prosecutor to "return the inmate to confinement in an appropriate facility designated by the Commissioner of Corrections" in the event that the State Parole Board determines that a parolee granted compassionate release is no longer so debilitated or incapacitated by a terminal condition, disease or syndrome, or by a permanent physical incapacity as to be physically incapable of committing a crime or, in the case of a permanent physical incapacity, the parolee poses a threat to public safety. N.J.S.A. 30:4-123.51e(j).

25

IV.

A.

We review the trial court's factual findings regarding F.E.D.'s medical condition to determine whether they are supported by substantial credible evidence in the record. That standard is analogous to the standard of review that applies to a trial court's factual findings in other settings, State v. Elders, 192 N.J. 224, 243-44 (2007); State v. Hubbard, 222 N.J. 249, 269 (2015), and to the standard of review that applies when the Parole Board's factual findings are reviewed on appeal, Trantino v. State Parole Bd., 166 N.J. 113, 121-22 (2001).

We disagree with the Appellate Division's suggestion that issuance of a Certificate of Eligibility by the Department of Corrections upon receipt of a medical diagnosis under N.J.S.A. 30:4-123.51e(d)(2) is a final agency decision that must be affirmed on appellate review unless it is arbitrary or capricious. See F.E.D., 469 N.J. Super. at 57-59. The Compassionate Release Statute makes no provision for the Department to make a final agency decision on the merits of the inmate's application. See N.J.S.A. 30:4-123.51e. Moreover, the Certificate of Eligibility issued by the Department upon receipt of a medical diagnosis does not constitute the Department's finding that the inmate has met his burden of proof by clear and convincing evidence on any issue. Rather,

that Certificate merely authorizes the inmate to request representation by the Office of the Public Defender, N.J.S.A. 30:4-123.51e(d)(3), and to file a petition for compassionate release in the Superior Court, N.J.S.A. 30:4-123.51e(e). Under the statute, the trial court, not the Department of Corrections, makes the initial determination whether the inmate has met his burden of proof by clear and convincing evidence, N.J.S.A. 30:4-123.51e(f), and that determination is subject to appellate review.

We review de novo the Appellate Division's interpretation of the Compassionate Release Statute, which is a legal determination. In re Civil Commitment of W.W., 245 N.J. 438, 448 (2021).

Our review is governed by familiar principles of statutory construction. When we interpret a statute, our goal is to "effectuate legislative intent." Gilleran v. Township of Bloomfield, 227 N.J. 159, 171 (2016). "To determine the Legislature's intent, [this Court] look[s] to the statute's language and give[s] those terms their plain and ordinary meaning because 'the best indicator of that intent is the plain language chosen by the Legislature.'" State v. J.V., 242 N.J. 432, 442-43 (2020) (citation omitted) (quoting Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016)).

"If the language is clear, the court's job is complete." In re D.J.B., 216 N.J. 433, 440 (2014). We resort to extrinsic evidence such as legislative

27

history only "when statutory language is ambiguous, or 'leads to more than one plausible interpretation.'" In re N.J. Firemen's Ass'n Obligation, 230 N.J. 258, 274 (2017) (quoting DiProspero v. Penn, 183 N.J. 477, 492-93 (2005)). We "strive for an interpretation that gives effect to all of the statutory provisions and does not render any language inoperative, superfluous, void[,] or insignificant." Sanchez v. Fitness Factory Edgewater, LLC, 242 N.J. 252, 261 (2020) (alteration in original) (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 171 (1999)); accord State v. Reynolds, 124 N.J. 559, 564 (1991).

B.

In this appeal, we address three questions of statutory interpretation. First, we construe the term "activities of basic daily living" as it appears in N.J.S.A. 30:4-123.51e(l), which defines a "permanent physical incapacity" as "a medical condition that renders the inmate permanently unable to perform activities of basic daily living" and "results in the inmate requiring 24-hour care." Second, we consider the number of "activities of basic daily living" that the Legislature requires that the inmate prove he is unable to perform in order to be deemed to suffer from a "permanent physical incapacity." Ibid. Third, we address N.J.S.A. 30:4-123.51e(f)(1)'s mandate that the inmate prove by clear and convincing evidence that he is "permanently physically incapable of committing a crime if released," and that an inmate relying on a permanent

28

physical incapacity to justify compassionate release also prove by clear and convincing evidence that "the conditions established in accordance with [N.J.S.A. 30:4-123.51e(h)] under which the inmate would be released would not pose a threat to public safety."

1.

The Compassionate Release Statute does not specify what tasks constitute "activities of basic daily living" as that term is used in N.J.S.A. 30:4-123.51e(*l*).  Other New Jersey laws, however, provide examples of "activities of daily living" in health-care settings.  See, e.g., N.J.S.A. 26:2Y-3 (defining "activities of daily living" for purposes of the New Jersey Adult Family Care Act, N.J.S.A. 26:2Y-1 to -11, to mean "functions and tasks for self-care which are performed either independently or with supervision or assistance, which include, but are not limited to, mobility, transferring, walking, grooming, bathing, dressing and undressing, eating, and toileting"); N.J.A.C. 10:60-1.2 (defining "[a]ctivities of daily living" in regulations addressing personal care assistance under Medicaid laws to mean "activities related to self-care, performed either independently or with supervision or

assistance," including, but "not limited to, dressing and undressing, bathing, eating, grooming, ambulation, transferring, toileting, and mobility").[8]

The Legislature modified the term "activities of daily living" with the adjective "basic" when it described the activities of daily living that a court should consider in determining whether an inmate has a "permanent physical incapacity." N.J.S.A. 30:4-123.51e(*l*). That language suggests legislative intent to distinguish "activities of basic daily living" from "instrumental activities of daily living," a term used in other contexts to describe tasks such as cooking, cleaning, laundry, and shopping. See N.J.A.C. 10:60-1.2 (defining "instrumental activities of daily living" to mean "those non-hands-on personal care assistance services that are essential to the beneficiary's health and comfort, including, but not limited to, housekeeping, food preparation, doing laundry, and shopping"); N.J.A.C. 12:15-1.1A (defining "instrumental activities of daily living" for purposes of certain insurance benefits to include "cooking, cleaning, shopping, taking public transportation, paying bills, maintaining a residence, using telephones and directories, using a post office, etc."); N.J.S.A. 26:2H-5.25 (listing "basic activities of daily living" and

---

[8] Those definitions are similar to the definition of "activities of basic daily living" prescribed in California's regulations implementing that state's medical parole act, Cal. Penal Code § 3550. See Cal. Code Regs. tit. 15, § 3359.1(a)(1) (defining activities of basic daily living as "breathing, eating, bathing, dressing, transferring, elimination, arm use, or physical ambulation").

"instrumental activities of daily living" as separate categories in the definition of "after-care assistance" in the Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 to -26).

We also find significant the Legislature's mandate that an inmate seeking compassionate release prove that, by virtue of his inability to perform "activities of basic daily living," he requires twenty-four-hour care. See N.J.S.A. 30:4-123.51e(*l*). That suggests that the "activities of basic daily living" denotes a limited number of rudimentary tasks.

In short, the statutory language signals the Legislature's intent that a court considering an inmate's contention that he has a "permanent physical incapacity" under N.J.S.A. 30:4-123.51e(*l*) should focus only on fundamental tasks essential to self-care. We therefore concur with the Appellate Division's conclusion that the term "activities of basic daily living" in N.J.S.A. 30:4-123.51e(*l*) includes eating, mobility, bathing, dressing, using a toilet, and transfers,[9] and excludes instrumental activities such as shopping, house cleaning, food preparation, and laundry. F.E.D., 469 N.J. Super. at 61-62.

---

[9]  We omit from the Appellate Division's list of activities of basic daily living the term "locomotion" which is encompassed by the term "mobility." See F.E.D., 469 N.J. Super. at 61-62.

31

2.

We next consider the number of "activities of basic daily living" that the inmate must prove he is incapable of performing by virtue of his medical condition in order to be deemed to have a "permanent physical incapacity" under N.J.S.A. 30:4-123.51e(f)(1) and -123.51e(*l*).

The Appellate Division viewed the statute to require the inmate to prove that he is unable to perform "any activity of basic daily living," so that if an inmate can perform even one of the enumerated activities of basic daily living, he is unable to meet the statutory standard. F.E.D., 469 N.J. Super. at 62 (citing N.J.S.A. 30:4-123.51e(*l*)). We disagree.

Nothing in the Compassionate Release Statute suggests the Legislature's intent that the inmate demonstrate that he is unable to perform any of the activities of basic daily living. Indeed, if the statute demanded a showing that, by virtue of the inmate's medical condition, he is incapable of eating, walking, bathing, dressing, using a toilet, and getting in and out of bed, compassionate release would be granted rarely, if at all. Such a construction of N.J.S.A. 30:4-123.51e(*l*) would render superfluous the Compassionate Release Statute's additional requirements -- that the court find by clear and convincing evidence that the inmate's permanent physical incapacity so debilitates or incapacitates him that he is "permanently physically incapable of committing a crime," and

32

that the inmate's release under conditions established under N.J.S.A. 30:4-123.51e(h) "would not pose a threat to public safety." N.J.S.A. 30:4-123.51e(f)(1).

The Legislature's chosen language confirms its intent. It used the plural "activities" in the phrase "permanently unable to perform activities of basic daily living," thus signaling that only inmates whose medical conditions render them unable to perform two or more activities of basic daily living may seek compassionate relief. N.J.S.A. 30:4-123.51e(*l*). It also tethered that requirement to the core mandate that the inmate require "24-hour care" in order to meet the definition of "permanent physical incapacity." Ibid. That language indicates that a court determining a petition for compassionate release should conduct a holistic inquiry into the impact of the inmate's medical condition on his ability to conduct activities of basic daily living without round-the-clock care.

Based on the plain language of N.J.S.A. 30:4-123.51e(*l*), we hold that an inmate has demonstrated a "permanent physical incapacity" for purposes of the Compassionate Release Statute if he proves by clear and convincing evidence that (1) he has a medical condition that did not exist at the time of sentencing; (2) that medical condition renders him permanently unable to perform two or

33

more activities of basic daily living; and (3) as a result of the inmate's inability to perform those activities, he requires twenty-four hour care.

3.

We next construe N.J.S.A. 30:4-123.51e(f)(1)'s "permanently physically incapable of committing a crime if released" and "would not pose a threat to public safety" requirements.

Given its holding that F.E.D. did not prove that he had a permanent physical incapacity as defined in N.J.S.A. 30:4-123.51e(*l*), the Appellate Division did not determine whether F.E.D. was "permanently physically incapable of committing a crime if released" under N.J.S.A. 30:4-123.51e(f)(1). F.E.D., 469 N.J. Super. at 66-67. It stated, however, that it was not convinced that the Legislature intended that requirement to be narrowly construed to include only crimes requiring "some level of physicality" given the statutory language and the Legislature's intent to create a strict standard. Id. at 67.

We do not view N.J.S.A. 30:4-123.51e(f)(1) to require an inmate to prove by clear and convincing evidence that he is so debilitated or incapacitated by his terminal condition, disease, or syndrome, or his permanent physical incapacity, that he is permanently physically incapable of committing any criminal offense. Were that the Legislature's intent, only an inmate who is

34

so debilitated or incapacitated that he cannot speak with a co-conspirator to plan a crime or type on a computer to commit an offense could be eligible for compassionate release.  See N.J.S.A. 30:4-123.51e(f)(1).

That interpretation would contravene the Legislature's intent to expand opportunities for compassionate release beyond those afforded by the now-repealed medical parole law, N.J.S.A. 30:4-123.51c.  See S. Judiciary Comm. Rep. on A. 2370; N.J. Crim. Sent'g & Disposition Comm'n, at 32.

Moreover, such a construction of N.J.S.A. 30:4-123.51e(f)(1)'s "permanently physically incapable of committing a crime if released" language would render superfluous that subsection's second requirement.  A person so debilitated or incapacitated that he is incapable of committing any crime -- on his own or by communicating with another person -- simply cannot pose a threat to public safety.  If an inmate were required to prove that he was incapable of committing any crime because of a "permanent physical incapacity" -- no matter how little physical strength or mobility that crime required -- N.J.S.A. 30:4-23.51e(f)(1)'s additional mandate that the inmate prove that he posed no threat to public safety under the conditions of his compassionate release would be meaningless.

We view the "physically incapable of committing a crime if released" language of N.J.S.A. 30:4-123.51e(f)(1) to warrant a more nuanced approach.

35

The court should conduct an individualized assessment of the inmate's risk of recidivism in order to assess whether he has met his burden of proof under that provision. It should determine whether that inmate is physically incapable, alone or with the assistance of another, of committing either the same crime or crimes of which he was previously convicted, or crimes similar to those of which he was convicted. For example, an inmate such as F.E.D., convicted of three murders, would be required to prove not only that his permanent physical incapacity renders him physically incapable, alone or with the assistance of another, of committing a murder or another violent crime, but that it also renders him physically incapable of soliciting another person to commit such a crime. The court thus determines whether the inmate's physical incapacity precludes his ability to engage in criminal conduct in the same general category as the conduct that led to his convictions.

For an inmate asserting a "permanent physical incapacity," this construction of the "physically incapable of committing a crime if released" language of N.J.S.A. 30:4-123.51e(f)(1) reserves a meaningful role for the statute's final requirement. Even if a court finds that the inmate has proven by clear and convincing evidence a permanent physical incapacity that renders him physically incapable of committing his prior offense or a similar offense if he is released, the inmate must prove that, in light of the conditions of release

established pursuant to N.J.S.A. 30:4-123.51e(h),[10] his release "would not pose a threat to public safety." N.J.S.A. 30:4-123.51e(f)(1). That inquiry is not limited to the threat that the inmate may commit any specific crime or category of crimes; instead, it involves a careful and comprehensive assessment of the inmate's medical condition, his criminal record, other aspects of his history, his parole plan, and other relevant considerations. Ibid.

C.

Applying the statutory standard, we agree with the trial court and the Appellate Division that F.E.D has not proven by clear and convincing evidence that he has a "permanent physical incapacity" within the meaning of N.J.S.A. 30:4-123.51e(*l*).

In his letter supporting F.E.D.'s petition for compassionate release, Dr. Lynch opined that F.E.D. had severe cardiomyopathy, that F.E.D.'s prognosis would be poor unless he received a transitional Automatic Implantable Cardioverter Defibrillator, that F.E.D. needed a LifeVest and infirmary

---

[10] Pursuant to N.J.S.A. 30:4-123.51e(h), the State Parole Board must ensure that the release plan provides for the identification of a community sponsor, verification of appropriate medical services, and verification of appropriate housing. In the release plan, the State Parole Board may also impose a requirement that the parolee undergo periodic medical examinations and may impose release conditions authorized by N.J.S.A. 30:4-123.59, which may include, among other conditions, restrictions on the parolee's access to firearms and computers and prohibitions on the parolee's contact with the victim or the victim's family. N.J.S.A. 30:4-123.51e(i).

housing, and that F.E.D. could not work or exercise due to his limited physical capacity. Dr. Lynch stated that F.E.D. would require significant help with three instrumental activities of daily living if he were released: laundry, grocery shopping, and meal preparation. However, his only reference to an "activity of basic daily living" was prospective; he stated that F.E.D. would need a wheeled walker for fall prevention "as his condition deteriorates." Dr. Lynch did not opine that at the time of his evaluation, F.E.D. could not walk eat, bathe, dress, use a toilet, or transfer in and out of bed without assistance. In short, Dr. Lynch's diagnosis did not suggest, let alone establish by clear and convincing evidence, that F.E.D. was unable to conduct activities of basic daily living, resulting in a need for twenty-four-hour care.

Dr. Perera similarly opined that F.E.D. suffered from cardiomyopathy, that he had a poor prognosis, that he required continued treatment including twenty-four-hour use of a LifeVest, and that he would need assistance with instrumental activities such as grocery shopping, meal preparation, laundry, and cleaning if released to a home setting. Dr. Perera confirmed that F.E.D. could conduct activities of daily living, albeit at a slow pace. Like Dr. Lynch, Dr. Perera opined that F.E.D. might need assistance with walking in the future as his condition worsened. She did not opine, however, that he was unable to

38

conduct any activity of basic daily living as defined in N.J.S.A. 30:4-123.51e(*l*), or that his condition required twenty-four-hour care.

Accordingly, we concur with the trial court and the Appellate Division that the attesting physicians' letters did not constitute proof by clear and convincing evidence that F.E.D.'s medical condition gave rise to a permanent physical incapacity within the meaning of N.J.S.A. 30:4-123.51e(*l*).

Nor did F.E.D. satisfy his burden of proof by clear and convincing evidence under the Compassionate Release Statute by virtue of the medical testimony that he presented at the hearing before the trial court. Dr. Soffer testified about the history of F.E.D.'s cardiomyopathy and the treatment that F.E.D. would continue to need but did not opine that F.E.D. was incapable of conducting any activity of basic daily living or that he required constant care. Dr. Soliman confirmed that although F.E.D.'s activities of daily living were "very limited," he could conduct them with assistance. As to whether F.E.D. required twenty-four hour care, Dr. Soliman stated that F.E.D. "would need some assistance in getting around," and that if F.E.D.'s "staging gets worse," he would need nursing-home care.

Like the diagnoses issued by the attesting licensed physicians under N.J.S.A. 30:4-123.51e(b), the expert testimony that F.E.D. presented to the trial court did not provide clear and convincing proof that F.E.D.'s medical

39

condition rendered him "permanently unable to perform activities of basic daily living" that "results in the inmate requiring 24-hour care." N.J.S.A. 30:4-123.51e(*l*).

Accordingly, the trial court's determination that F.E.D. did not suffer from a "permanent physical incapacity" as defined in N.J.S.A. 30:4-123.51e(*l*) was supported by substantial credible evidence in the record. We agree with the Appellate Division that the trial court properly denied F.E.D.'s petition for compassionate release. See F.E.D., 469 N.J. Super. at 64-65. We do not reach the question whether F.E.D. proved by clear and convincing evidence that he had a permanent physical incapacity that rendered him permanently physically incapable of committing a crime if released, or the question whether conditions established in accordance with N.J.S.A. 30:4-123.51e(h) under which F.E.D. would be released would not pose a threat to public safety. See N.J.S.A. 30:4-123.51e(f)(1).[11]

### D.

We briefly comment on the impact of the Compassionate Release Statute's confidentiality provision, N.J.S.A. 30:4-123.51e(e)(4), on trial and

---

[11] Nothing in N.J.S.A. 30:4-123.51e precludes an inmate whose petition for compassionate release has been denied, or any other person authorized by N.J.S.A. 30:4-123.51e(c) to seek a medical diagnosis under the Compassionate Release Statute, from initiating a new compassionate release proceeding based on an updated assessment of the inmate's medical condition.

appellate courts' review of an inmate's petition for compassionate release. That provision states that the information contained in the petition and the contents of any responding comments by a recipient of the petition "shall be confidential and shall not be disclosed to any person who is not authorized to receive or review the information or comments." Ibid.

As an exception to the rule that court records are open to the public, see R. 1:38-1, "[r]ecords required to be kept confidential by statute, rule, or prior case law consistent with this rule, unless otherwise ordered by a court upon a finding of good cause" are excluded from public access, R. 1:38-3. By virtue of N.J.S.A. 30:4-123.51e(e)(4), F.E.D.'s petition for compassionate release has been filed under seal in this appeal.

The designated licensed physicians' opinions and other medical information set forth in F.E.D.'s petition for compassionate release, however, are crucial to our determination of this appeal, as they were central to the decisions of the trial court and the Appellate Division. Consistent with our obligation to explain the basis for our decisions, we address that medical information in this opinion. See R. 1:38-1A (providing in part that "[t]rial court or appellate court decisions, whether rendered orally or in writing, and whether published or unpublished, may quote from or make reference to

information in court records even when those records are excluded from public access").

Because of the confidentiality restrictions set forth in N.J.S.A. 30:4-123.51e(e)(4), we have refrained from identifying F.E.D. in this decision, as did the Appellate Division in its decision. See F.E.D., 469 N.J. Super. at 48 n.1. That is not consistent with our general practice. With narrow exceptions, we disclose to the public in our opinions the identity of adult litigants in the appeals that we decide, even when information about a litigant's medical condition is addressed in an opinion. See generally R. 1:38-1 (noting "the policy of open access to records of the judiciary").

Here, we address a statute under which inmates convicted of serious crimes and not yet eligible for parole may seek release from incarceration. See generally N.J.S.A. 30:4-123.51e. The Legislature recognized in the Compassionate Release Statute the right of victims and members of their families to receive notice that an inmate seeks release under the statute's terms. See N.J.S.A. 30:4-123.51e(e)(2). It determined that a petition for compassionate release should be decided in a court hearing, rather than in an administrative proceeding. N.J.S.A. 30:4-123.51e(e).

We respectfully urge the Legislature to provide guidance with respect to whether it envisions that our courts will depart from our general practice of

42

disclosing to the public the identity of a litigant seeking relief in the setting of a future compassionate relief proceeding.

## V.

The judgment of the Appellate Division is affirmed as modified.

CHIEF JUSTICE RABNER; JUSTICES SOLOMON and PIERRE-LOUIS; and JUDGE FUENTES (temporarily assigned) join in JUSTICE PATTERSON's opinion.